**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND; and CHARLES A. WHOBREY, as Trustee, | ) | |
| *Plaintiffs,* | ) | Case No. 25-cv-03938 |
| v. | ) | Judge |
| | ) | Magistrate Judge |
| ALAN MCCLAIN, in his official capacity as Insurance Commissioner of Arkansas; and the ARKANSAS INSURANCE DEPARTMENT, | ) | |
| *Defendants*. | ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF**

Plaintiffs Central States, Southeast and Southwest Areas Health and Welfare Fund (the "Fund") and Charles A. Whobrey, one of the Fund's present trustees, allege as follows:

**INTRODUCTION**

1. This action seeks a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., that Arkansas Insurance Department Rule 128: Fair and Reasonable Pharmacy Reimbursements ("Rule 128") is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., as well as injunctive relief preventing the enforcement of Rule 128 against the Fund. Rule 128 impermissibly refers to and regulates ERISA health plans and imposes requirements on central matters of plan administration and plan design. Specifically, Rule 128 requires health plans to: (1) report certain cost data to support their pharmacy reimbursement programs; and (2) pay additional dispensing fees if it is determined that their

current reimbursement is unfair. The Court should declare Rule 128 preempted and enjoin Defendants from its enforcement.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action under section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under federal law.

3. Venue is proper in this Court under section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), in that the Fund is an "employee welfare benefit plan" as that term is defined in ERISA and is administered at its principal and exclusive office located at 8647 West Higgins Road, Chicago, Illinois.

## PARTIES

4. The Fund is a self-funded, multiemployer employee welfare benefit plan governed by ERISA. *See* 29 U.S.C. § 1002(1).

5. The Fund is primarily funded by contributions remitted by multiple participating employers pursuant to negotiated collective bargaining agreements with local unions affiliated with the International Brotherhood of Teamsters ("IBT") on behalf of employees of those same employers. All principal and income from such contributions and investments thereof is held and used for the exclusive purpose of providing health and welfare benefits to the Fund's participants and beneficiaries and paying the Fund's administrative expenses.

6. Plaintiff Charles A. Whobrey is a trustee and "fiduciary" of the Fund as that term is defined in ERISA. Pursuant to section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Charles A. Whobrey is authorized to bring this action on behalf of the Fund and its participants and beneficiaries in his capacity as a trustee and fiduciary.

7. The Fund provides health coverage to approximately 500,000 participants and covered dependents located across the United States – including to approximately 6,000 Arkansas residents. As part of the health coverage, the Fund provides prescription drug benefits and gives its participants and covered dependents access to a pharmacy network that the Fund's pharmacy benefit manager, CVS Caremark ("CVS"), maintains.

8. Defendant Alan McClain is the Insurance Commissioner for the State of Arkansas (the "Commissioner"). The Commissioner's principal place of business is 1 Commerce Way, Little Rock, Arkansas. The Commissioner is being sued solely in his official capacity.

9. Defendant Arkansas Insurance Department ("AID") is a department of the government of the State of Arkansas. AID is headquartered at 1 Commerce Way, Little Rock, Arkansas.

10. Defendants, and those subject to Defendants' supervision, direction and/or control, are responsible for enforcing Rule 128.

**FEDERAL PREEMPTION OF STATE LAWS**

11. The Supremacy Clause of the United States Constitution establishes that federal law takes precedence over state laws. U.S. Const. Art. VI, cl. 2. As such, state laws are prohibited from interfering with federal law, including the United States Constitution and federal statutes. A state law that interferes with federal law is preempted. Preemption can be either express or implied. Express preemption occurs when Congress explicitly states its intent to preempt state laws that regulate a given topic.

12. ERISA is a comprehensive federal statute that regulates employee benefit plans. 29 U.S.C. § 1001, *et. seq*. Congress enacted ERISA to provide "a uniform regulatory regime over employee benefit plans … to ensure that employee benefit plan regulation would be exclusively a

federal concern." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (internal quotations omitted). To facilitate nationally uniform and efficient benefits administration and ensure that ERISA plans do not face competing or conflicting legal regimes in each of the 50 states, Congress included a broad express preemption clause in the statute which provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).

## FACTS

### A. The Key Parties in the Prescription Drug Market

13. Many Americans receive their prescription drug benefits through health benefit plans, including employer-sponsored self-funded and insured health benefit plans.

14. When a health benefit plan beneficiary fills a prescription at a pharmacy, the resulting transaction is the product of a complex supply chain, with contracts and payment flows involving multiple parties. Some of the key players are:

- ***Manufacturers,*** which research, develop, and bring new drug products to market.
- ***Wholesalers,*** which act as distributors of drug products. Wholesalers purchase the drug product from manufacturers and distribute it to pharmacies and health care providers. Wholesalers serve as intermediaries and manage drug product inventory, warehousing, and shipment logistics to pharmacies and health care providers.
- ***Pharmacies,*** which dispense drug products to patients. To do so, they purchase drugs or drug ingredients from wholesalers. The primary types of pharmacies include retail, mail order, online, specialty, and institutional.
- ***Pharmacy services administrative organizations,*** which manage and negotiate contracts with pharmacy benefit managers on behalf of independent pharmacies. This involves the negotiation of contract terms, reimbursement levels, and participation in pharmacy networks.
- ***Pharmacy Benefit Managers ("PBMs"),*** which contract with health plans and insurers to manage their prescription-drug benefits. PBMs design formularies, contract with manufacturers to negotiate rebates on drugs, contract with pharmacies

or pharmacy services administrative organizations to design pharmacy networks, and process and pay prescription claims.

- ***Health plans or insurers,*** which provide coverage for, and are the ultimate payers of, medical and pharmacy services to their members. Employers and members pay for coverage. Health plans or insurers often contract with PBMs to leverage the PBMs' economies of scale in managing their prescription drug benefits.

15. Manufacturers produce the drug product and establish the list price. Wholesalers then purchase the drug product from manufacturers based on list price with or without discounts.

16. Wholesalers distribute the drug product to pharmacies. Contracts between pharmacies and wholesalers determine the rate that pharmacies pay wholesalers for the drugs. Group purchasing organizations may play a role in the negotiation of purchasing rates.

17. In some cases, the price at which the wholesaler distributes the drug to the pharmacy is lower than the price that the wholesaler negotiated with the manufacturer. In these instances, wholesalers invoice the manufacturer to recover the difference in the form of a chargeback.

18. Pharmacies dispense drugs to patients and collect out-of-pocket payments from them. Patient out-of-pocket payments include payments toward the deductible of the health plan or insurance policy, as well as copayments (fixed amounts) or coinsurance (calculated as a percentage). These amounts are established under the terms of the documents governing the plan of benefits offered to employees and their families.

**B. The Role of PBMs**

19. Because PBMs have the expertise and ability to negotiate prescription drug costs and maximize patient access by offering pharmacy networks, nearly all insurers and health plans – public and private – provide prescription drug coverage by utilizing a PBM's services.

20. PBMs offer health plans a variety of services to manage their prescription drug benefits. PBMs process claims and make disbursements. In addition, health plans engage PBMs to increase access for beneficiaries, drive value, and improve quality of care.

21. PBMs also design formularies, which are lists of drugs that a health plan covers. Typically, PBMs negotiate for manufacturer price concessions based on the volume of drug product used and placement in the formulary. These price concessions often take the form of rebates.

22. PBMs pass a share of rebates to health plans or insurers, depending on the contract between them.

23. Health plans will select a PBM through a competitive bidding process, in which PBMs submit bids in response to requests for proposals from a health plan. PBMs compete on both financial and service terms. A PBM seeks to differentiate itself from its competitors to potential customers via its drug prices, administrative fees and other charges for its services, the breadth of its pharmacy network, and other operational, clinical and member services.

24. Health plans individually negotiate their contracts with PBMs. In these contracts, PBMs make various guarantees related to services and drug pricing, including obligations for the PBM to offer certain pharmacy networks.

**C. Pharmacy Reimbursement**

25. PBMs typically design pharmacy networks and negotiate with pharmacies to set a competitive rate at which the PBM will reimburse a pharmacy for each prescription that it fills. These networks are essential to PBMs' contracts with health plans because they allow PBMs to help ensure that a health plan's members – employees and their families – will receive adequate service, including accessibility.

26. To offer beneficiaries and plan sponsors additional cost savings, PBMs create preferred pharmacy networks. Preferred pharmacy networks are networks of pharmacies where plans and beneficiaries pay a lower amount for a drug than they would at a pharmacy in the standard network.

27. A preferred pharmacy network provides value to beneficiaries and plan sponsors. Beneficiaries benefit from lower copays and other cost sharing discounts for drugs they obtain at a pharmacy in the preferred pharmacy network. These lower copays and other cost sharing discounts incentivize beneficiaries to purchase drugs from preferred pharmacies. Health plans benefit because pharmacies agree to lower reimbursement rates in exchange for participation in the preferred pharmacy network. Pharmacies agree to participate in a preferred network to obtain a higher volume of patients.

28. Pharmacy reimbursement rates are established in the PBM network contracts, which are negotiated between pharmacies and PBMs directly or, in the case of independent pharmacies, often through pharmacy services administrative organizations, which negotiate with PBMs on behalf of their members.

29. PBMs negotiate reimbursement contracts with pharmacies and leverage the volume of a health plan's enrollees to incentivize pharmacies to agree to lower reimbursement amounts.

30. The pharmacies in a PBM's network fill prescriptions for health plan members using prescription drugs, which the pharmacies have directly purchased from wholesalers or manufacturers. When a health plan member goes to a pharmacy to fill a prescription, the pharmacy confirms the applicable plan design for the health plan member with the PBM to determine coverage and copayment or coinsurance information. After the prescription is filled, the PBM reimburses the pharmacy at a contractually agreed to, negotiated rate which commonly includes

payment for the drug as well as a dispensing fee minus the copay or coinsurance that the pharmacy collected from the patient.

31. The dispensing fee is a contracted compensation rate paid to a pharmacy for filling a prescription and processing the claim.

**D. Arkansas Insurance Department Rule 128: Fair and Reasonable Pharmacy Reimbursements**

32. Rule 128 was initially effective on or about September 20, 2024, as a temporary emergency rule. *See* Ark. Code R. §§ 003.22.128–I to 003.22.128–VII.

33. On December 20, 2024, the Arkansas Legislative Council voted to make the emergency rule permanent.

34. On December 20, 2024, the Commissioner issued Exhibit A to replace the temporary emergency rule.

35. Rule 128 (as stated in Exhibit A) provides that it was issued to implement the Arkansas Pharmacy Benefits Manager Licensure Act, Ark. Code Ann. § 23-92-501 *et seq.*, for compensation and pharmacy benefits manager network adequacy.

36. Rule 128 broadly applies to all health benefit plans as defined in Ark. Code Ann. § 23-92-503(2) and healthcare payors as defined in Ark. Code Ann. § 23-92-503(3). The term "health benefit plan" is defined as "any individual, blanket, or group plan, policy, or contract for healthcare services issued or delivered by a healthcare payor to residents of [Arkansas]." Ark. Code Ann. § 23-92-503(2). The term "healthcare payor" includes an "entity that provides or administers a self-funded health benefit plan, including a governmental plan." Ark. Code Ann. § 23-92-503(3).

37. Pursuant to Rule 128, the Commissioner is allowed to review the compensation program of a PBM from a health benefit plan to ensure that the reimbursement for pharmacist services paid to a pharmacist or pharmacy is "fair and reasonable."

38. In furtherance of its purpose, Rule 128 includes a reporting obligation that requires health benefit plans to submit to the Commissioner certain pharmacy compensation information that the Commissioner may use to confirm whether such payments to Arkansas pharmacists and pharmacies are fair and reasonable (the "Reporting Requirement").

39. If the Commissioner determines that the pharmacy compensation program of a reporting health benefit plan is not fair and reasonable to ensure an adequate network of participating pharmacies, the Commissioner can require the health benefit plan to pay an additional pharmacy dispensing cost to ensure that the health benefit plan offers an adequate network of pharmacy providers (the "Dispensing Fee Requirement"). If the Commissioner determines the data provided by the health benefit plan is "fair and reasonable," then no further action or adjustment is needed.

40. To implement Rule 128, the Commissioner issued AID Bulletin #18-2024 (attached as Exhibit B and hereinafter referred to as the "Bulletin") on December 20, 2024.

41. The Bulletin provides that pursuant to Ark. Code Ann. § 23-92-506(a)(1), the Commissioner may review and approve a health benefit plan's compensation program of a PBM to ensure that the pharmacist's or pharmacy's reimbursement received for its pharmacist services is fair and reasonable to provide an adequate pharmacy benefits manager network for a health benefit plan.

42. The Bulletin further describes the Reporting Requirement and provides that health benefit plans are required to annually report certain data to AID. For 2025, health benefit plans

may file the required data for AID's review beginning on November 30, 2024, and must file this data by February 17, 2025. For plan year 2026, health benefit plans must report the required data to AID by July 1, 2025. For subsequent plan years, the annual reporting deadline is March 1.

43. The Bulletin requires health benefit plans to submit written data to AID for the Commissioner's review. The required data includes:

(a) the total annual average percentage of total pharmacy reimbursement above or relative to NADAC pricing (or WAC, wholesale acquisition cost if NADAC is unavailable) in the previous calendar year;

(b) the average dispensing fee paid to pharmacies from total pharmacy reimbursement in the previous calendar year;

(c) the total number of drug reimbursement claims paid during the prior calendar year for generic, brand and specialty drugs;

(d) pharmacy network retention data in the previous calendar year which may include a report on the number of pharmacies that the health benefit plan or PBM lost or gained;

(e) the total amount of adjustments that the health benefit plan's PBM made during the previous plan year in response to pharmacies' appeals or complaints regarding payments below NADAC or maximum allowable cost during the previous calendar year;

(f) for health benefit plans contracting with PBMs that have PBM affiliates, the average annual reimbursement percentage of reimbursement to PBM affiliate pharmacies relative to non-PBM affiliate pharmacies;

(g) any additional proposed contribution or increases in pharmacy reimbursement that may increase annual average pharmacy reimbursement above NADAC base averages; and

(h) other data related to cost impact, including:

(i) the total projected increase in drug costs that a health benefit plan would incur if a pharmacy dispensing cost was applied to the plan for drug payment transactions in the following amounts of dispensing costs ($1, $2, $4, $6, $8, and $10.50);

(ii) the projected premium impact that a health benefit plan would incur if a pharmacy dispensing cost was applied to the plan for drug payment transactions in the following amounts of dispensing costs ($1, $2, $4, $6, $8, and $10.50); and

(iii) the per member per month projected cost increase in premium if a pharmacy dispensing cost was applied to the plan for drug payment transactions in the following amounts of dispensing costs ($1, $2, $4, $6, $8, and $10.50).

44. The Bulletin further describes the Dispensing Fee Requirement. It provides that the Commissioner shall review a health plan's data and determine whether a health plan's pharmacy compensation program is already adequate to ensure an adequate pharmacy network or whether a health benefit plan shall be required to pay an additional dispensing cost for the health benefit plan to achieve a fair and reasonable pharmacy compensation program to ensure an adequate and sustainable network of pharmacies for the projected plan year.

45. The Bulletin expressly provides that Rule 128 applies to self-funded employer health benefit plans and self-funded government health benefit plans.

46. In AID's public comments summary for Rule 128, Defendants have also stated their opinion that ERISA does not preempt Rule 128.

47. Thus, Defendants intend to apply Rule 128's Reporting and Dispensing Fee Requirements to health plans that are governed by ERISA, including the Fund.

**CLAIM FOR RELIEF – ERISA PREEMPTION**

48. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 47 as if fully set forth herein.

49. Section 502(a)(3) of ERISA provides that "[a] civil action may be brought ... by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C § 1132(a)(3).

50. ERISA is a comprehensive federal statute that regulates employee benefit plans with the purpose of establishing uniform, national standards for employee benefit plans.

51. ERISA's broad preemption clause provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).

52. ERISA provides detailed and extensive reporting, disclosure, and recordkeeping requirements which are "central to, and an essential part of, the uniform system of plan administration contemplated by ERISA." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 321, 323 (2016). For example, Part 1 of Subtitle B of ERISA sets forth a plan administrator's reporting and disclosure duties. 29 U.S.C. §§ 1021-1030. These requirements include filing an annual report with the Secretary of Labor. *See* 29 U.S.C. § 1023. The annual report includes identifying

information regarding the plan, the number of participants, the plan's funding arrangement and the plan's benefit arrangement. ERISA also imposes a specific reporting obligation on group health plans with respect to the cost of prescription drugs. *See* 29 U.S.C. § 1185n.

53. ERISA makes clear that the United States Department of Labor is the entity Congress contemplated and authorized to collect and analyze data regarding ERISA health plans. Section 513 of ERISA expressly authorizes the Secretary of Labor "to undertake research and surveys and in connection therewith to collect, compile, analyze and publish data, information, and statistics relating to ... welfare plans" such as the Fund. 29 U.S.C. § 1143(a). Notably, ERISA does not give this authority to the States.

54. In exercising the authority ERISA confers upon it, the Department of Labor requires plans to annually report certain prescription drug spending information to the Department. *See* 29 C.F.R. §§ 2590.725-2, 2590.725-4. The annual report does not require disclosure of the information the Commissioner seeks under Rule 128, nor does it mandate that those reports be submitted to any State or subdivision thereof, like the AID.

55. Rule 128 governs "plan reporting, disclosure, and – by necessary implication – recordkeeping. These matters are fundamental components of ERISA's regulation of plan administration. Differing, or even parallel, regulations from multiple jurisdictions could create wasteful administrative costs and threaten to subject plans to wide-ranging liability." *Gobeille*, 577 U.S. at 323. Thus, Rule 128's Reporting Requirement has an impermissible connection with ERISA health plans and governs a central matter of plan administration.

56. Additionally, Rule 128's Dispensing Fee Requirement has an impermissible connection with ERISA health plans because it dictates plan design by regulating the plan's pharmacy network.

57. Rule 128 clearly and directly regulates self-insured, ERISA-covered group health plans and has an impermissible connection with those plans by requiring such plans to report certain pharmacy compensation information and dictating plan design by regulating the plan's pharmacy network. Accordingly, Rule 128 is expressly preempted by ERISA.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request the following relief:

(a) Declare that Rule 128 is preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*;

(b) Grant permanent injunctive relief enjoining Defendants and their agents from taking any action under, or to enforce, Rule 128 as to the Fund;

(c) Award Plaintiffs their reasonable attorney's fees and costs incurred in this action pursuant to section 502(g) of ERISA, 29 U.S.C. § 1132(g)(1); and

(d) Grant Plaintiffs such further or different relief as this Court may deem proper and just.

Respectfully submitted,

*/s/ Sarah M. Gortowski*

Sarah M. Gortowski (ARDC #6349107)
(847) 777-4031
sgortows@centralstatesfunds.org
Charles H. Lee (ARDC #6244633)
(847) 939-2481
chlee@centralstatesfunds.org
CENTRAL STATES FUNDS
Law Department
8647 W. Higgins Road, 8th Floor
Chicago, Illinois 60631

April 11, 2025

*ATTORNEYS FOR PLAINTIFFS*